An official website of the United States government, Department of Justice. Here's how you know

FILED
2023 Sep-05 PM 05:07
U.S. DISTRICT COURT
N.D. OF ALABAMA

Exhibit A

NIJ National Institute of Justice
STRENGTHEN SCIENCE. ADVANCE JUSTICE.

Menu

# From Youth Justice Involvement to Young Adult Offending

March 10, 2014

Scholars and laypeople alike debate what causes young people to commit crimes. Although most states mark the legal transition from adolescence to adulthood at age 18, researchers question whether the human brain is fully mature at that age. As part of the NIJ Study Group on the Transition from Juvenile Delinquency to Adult Crime, several scholars examined the differences between juveniles who persist in offending and those who do not, and also looked at early adult-onset offending.

On this page find:

- The Age-Crime Curve
- Persistence, Desistance and Onset
- Special Categories of Offenders
- Preventive Actions for Known Delinquents
- Financial Benefits and Costs of Interventions
- Research and Policy Recommendations
- Study Group Reports

**Study Reports**

Read the Study Group's final reports.

## The Age-Crime Curve

The prevalence of offending tends to increase from late childhood, peak in the teenage years (from 15 to 19) and then decline in the early 20s. This bell-shaped age trend, called the age-crime curve, is universal in Western populations (see Figure 1).[1]

However, specific versions of the curve vary in significant ways. The curve for violence tends to peak later than that for property crimes.[2] Girls peak earlier than boys.[3] The curve is higher and wider for young males (especially minorities) growing up in the most disadvantaged neighborhoods.[4]

% Arrested for Violence
12
10
8
6
4
2
0
9 10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 25
Age

Figure 1: An example of an age-crime curve
Source: Loeber, Rolf, and Rebecca Stallings, "Modeling the Impact of Interventions on Local Indicators of Offending, Victimization, and Incarceration," in Young Homicide Offenders and Victims: Risk Factors, Prediction, and Prevention from Childhood, eds. Rolf Loeber and David P. Farrington, New York: Springer, 2011: 137-152. (View larger image.)

## Persistence, Desistance and Onset

Continuity of offending from the juvenile into the adult years is higher for people who start offending at an early age, chronic delinquents, and young people who commit violent offenses. The Pittsburgh Youth Study found that 52 to 57 percent of justice-involved youth continue to offend up to age 25. This number dropped by two-thirds — to 16 to 19 percent — in the next five years.[5] However, there are large individual differences at play. Juveniles who start offending before age 12 are more likely to continue offending into early adulthood.[6]

Not all offense types have the same persistence. One study showed that drug dealing and possession of weapons had the highest likelihood of duration and persistence into early adulthood, while gang membership had a shorter duration. Marijuana use had the longest duration, two to four times longer than theft and violence.[7]

The median age of termination of offending was highest for drug trafficking (age 21.6). Minor offenses such as shoplifting and vandalism usually stop before age 18.[8]

The annual frequency of offending is higher for nonviolent crimes than for violence. The frequency usually peaks around ages 17-19 and remains stable over time only for a small number of individuals.[9]

Studies agree that 40 to 60 percent of justice-involved youth stop offending by early adulthood. For those who do persist, the transition from adolescence to adulthood is a period of increasing severity of offenses and an increase in lethal violence.[10] Most of the violence is directed at victims of the same age, and the age period of 16-24 is a high-risk time for violent victimization.[11] Many young people who offend at ages 18-20, which brings them into the adult justice system, would have been likely to desist naturally in the next few years.[12] Justice system processing may make them worse, rather than better. Somewhere between 10 percent and 30 percent of individuals start offending during early adulthood.[13]

Developmental studies of late adolescence and early adulthood do not support the notion that there is any naturally occurring break in the prevalence of offending at age 18.

## Special Categories of Offenders

The average age of onset is earliest for gang membership (average age of 15.9), followed by marijuana use (16.5), drug dealing (17.0), gun carrying (17.3) and hard drug use (17.5).[14] Although drug dealing is rare, drug use is widespread among these individuals. Criminals report higher rates of substance use, and substance users report higher rates of offending compared with nonusers.[15] Of all offenses, dealing drugs and illegally carrying guns have the highest persistence from adolescence into adulthood.

Joining a gang increases the rate of offending, but gang involvement is often transient. One study found that most youths who join gangs do so at very early ages, typically between 11 and 15; ages 14-16 are the peak for gang involvement.[16] In contrast, most homicides are single events committed in the 19-24 age range. However, gang killings take place mostly during adolescence.

The studies looked at risk and protective factors. There is strong evidence that, for males, getting married and holding a stable job foster desistance from offending and that unstructured activities with peers are associated with persistence.[17]

The sparse research on adult-onset offending provides little information about why some people who were not delinquent during adolescence become adults who commit offenses. However, there is evidence that some factors inhibit offending during adolescence but not during adulthood. One study found that characteristics such as nervousness, anxiousness, social isolation and social inhibition were associated with adult-onset offending.[18]

## Preventive Actions for Known Delinquents

There is good evidence that early interventions in childhood, such as home visits by nurses, preschool intellectual enrichment programs and parent management training, are effective in preventing delinquency. For example, an evaluation of the Elmira (N.Y.) Nurse-Family Partnership program found that at age 15, children of the higher-risk mothers who received home visits had significantly fewer arrests than controls. Another follow-up when the children were 19 showed that the daughters (but not the sons) of mothers who received home visits had significantly fewer arrests and convictions.[19]

Programs that target individuals can reduce offending in the early adult years. For example, the Seattle Social Development Project combined parent training, teacher training and skills training for children beginning at age 6.[20] At age 27, the intervention group scored significantly better on educational and economic attainment, mental health, and sexual health, but not on substance abuse or offending.[21]

Some interventions with older justice-involved youth (ages 14-17) have been successful. One long-term follow-up found that Multisystemic Therapy (MST) participants had lower recidivism rates (50 percent versus 81 percent), including lower rates of rearrest for violent offenses (14 percent compared with 30 percent). MST participants also spent 57 percent fewer days confined in adult detention facilities.[22]

Rate This Page

## Financial Benefits and Costs of Interventions

The financial benefits of intervention programs often outweigh the costs. One review found that this was true of multidimensional treatment foster care (MTFC) ($8 saved per $1 expended), functional family therapy ($10 saved per $1 expended), MST ($3 saved per $1 expended), vocational education in prison ($12 saved per $1 expended), cognitive-behavioral therapy in prison ($22 saved per $1 expended), drug treatment in prison ($6 saved per $1 expended) and employment training in the community ($12 saved per $1 expended).[23]

## Research and Policy Recommendations

The Study Group concluded that there are significant gaps in knowledge about the development of offending careers between ages 15 and 29. Researchers know surprisingly little about how many juveniles persist into adult offending and what factors predict persistence. More needs to be known about factors that may influence offending between ages 15 and 29.

The researchers concluded that young adults ages 18-24 are more similar to juveniles than to adults with respect to their offending, maturation and life circumstances.

Changes in legislation to deal with large numbers of juvenile becoming adult criminals should be considered. One possibility is to raise the minimum age for referral to the adult court to 21 or 24, so that fewer individuals would be dealt with in the adult system.

Alternatively, special courts for young persons ages 18-24 could be established on an experimental basis, building on the experience of the United Kingdom. Several European countries, including Sweden, Germany and Austria, have long had separate young adult sentencing options and separate institutions for individuals ages 18-21. Special facilities for young adults already exist in some states, such as Pennsylvania.

Beyond that, there could be an "immaturity discount" for young adults that would involve a decrease in the severity of penalties, taking into account a young person's lower maturity and culpability.

## Study Group Reports

Bulletin 1: From Juvenile Delinquency to Young Adult Offending (Study Group on the Transition from Juvenile Delinquency to Adult Crime). Final technical report by Rolf Loeber, David P. Farrington and David Petechuk. NCJ 242931.

Bulletin 2: Criminal Career Patterns (Study Group on the Transition from Juvenile Delinquency to Adult Crime). Final technical report by Alex R. Piquero, J. David Hawkins, Lila Kazemian and David Petechuk. NCJ 242932. Read a summary of this report: Criminal Career Patterns (pdf, 2 pages)

Bulletin 3: Explanations for Offending (Study Group on the Transition from Juvenile Delinquency to Adult Crime). Final technical report by Terence P. Thornberry, Peggy C. Giordano, Christopher Uggen, Mauri Matsuda, Ann S. Masten, Erik Bulten, Andrea G. Donker and David Petechuk. NCJ 242933.

Bulletin 4: Prediction and Risk/Needs Assessment (Study Group on the Transition from Juvenile Delinquency to Adult Crime). Final technical report by Robert D. Hoge, Gina Vincent and Laura Guy. NCJ 242934. Read a summary of this report: Prediction and Risk/Needs Assessment (pdf, 2 pages)

Bulletin 5: Young Offenders and an Effective Response in the Juvenile and Adult Justice Systems: What Happens, What Should Happen, and What We Need to Know (Study Group on the Transition from Juvenile Delinquency to Adult Crime)**Final technical report by James C. Howell, Barry C. Feld, Daniel P. Mears, David P. Farrington, Rolf Loeber and David Petechuk. NCJ 242935. Read a summary of this report: Young Offenders: What Happens and What Should Happen (pdf, 3 pages).**

Bulletin 6: Changing Lives: Prevention and Intervention to Reduce Serious Offending (Study Group on the Transition from Juvenile Delinquency to Adult Crime). Final technical report by Brandon C. Welsh, Mark W. Lipsey, Frederick P. Rivara, J. David Hawkins, Steve Aos, Meghan E. Peel and David Petechuk. NCJ 242936. Read a summary of this report: Changing Lives: Prevention and Intervention to Reduce Serious Offending (pdf, 8 pages).

**Notes**

[note 1] Farrington, David P., "Age and Crime," in *Crime and Justice: An Annual Review of Research*, vol. 7, eds. Michael Tonry and Norval Morris, Chicago, Ill.: University of Chicago Press, 1986: 189-250; Piquero, Alex R., David P. Farrington, and Alfred Blumstein, *Key Issues in Criminal Career Research: New Analyses of the Cambridge Study in Delinquent Development*, Cambridge, U.K.: Cambridge University Press, 2007.

[note 2] Blokland, Arjan A.J., and Hanneke Palmen, "Criminal Career Patterns," in *Persisters and Desisters in Crime From Adolescence Into Adulthood: Explanation, Prevention and Punishment*, eds. Rolf Loeber, Machteld Hoeve, N. Wim Slot, and Peter H. van der Laan, Aldershot, U.K.: Ashgate, 2012: 13-50; Piquero, Alex R., J. David Hawkins, and Lila Kazemian, "Criminal Career Patterns," in *From Juvenile Delinquency to Adult Crime: Criminal Careers, Justice Policy, and Prevention*, eds. Rolf Loeber and David P. Farrington, New York: Oxford University Press, 2012: 14-46.

[note 3] Blokland, Arjan A.J., and Hanneke Palmen, "Criminal Career Patterns," in *Persisters and Desisters in Crime From Adolescence Into Adulthood: Explanation, Prevention and Punishment*, eds. Rolf Loeber, Machteld Hoeve, N. Wim Slot, and Peter H. van der Laan,Aldershot, U.K.: Ashgate, 2012: 13-50; Farrington, David P., "Age and Crime," in *Crime and Justice: An Annual Review of Research*, vol. 7, eds. Michael Tonry and Norval Morris, Chicago, Ill.: University of Chicago Press, 1986: 189-250; Elliott, Delbert S., Fred Pampel, and David Huizinga, *Youth Violence: Continuity and Desistance. A Supplemental Report to Youth Violence: A Report of the Surgeon General*, Boulder, Colo.: Center for the Study and Prevention of Violence, Institute of Behavior Science, University of Colorado, 2004.

[note 4] Fabio, Anthony, Li-Chuan Tu, Rolf Loeber, and Jacqueline Cohen, "Neighborhood Socioeconomic Disadvantage and the Shape of the Age-Crime Curve," *American Journal of Public Health* 101 (Suppl 1) (July 2011): S325-332; Elliott, Delbert S., Fred Pampel, and David Huizinga, *Youth Violence: Continuity and Desistance. A Supplemental Report to Youth Violence: A Report of the Surgeon General*, Boulder, Colo.: Center for the Study and Prevention of Violence, Institute of Behavior Science, University of Colorado, 2004.

[note 5] Stouthamer-Loeber, Magda, "Persistence and Desistance in Offending" (unpublished report, Pittsburgh, Pa.: Life History Research Program, University of Pittsburgh, 2010).

[note 6] Loeber, Rolf, and David P. Farrington, *Young Homicide Offenders and Victims: Risk Factors, Prediction, and Prevention From Childhood,* New York: Springer, 2011.

[note 7] Rosenfeld, Richard, Helene R. White, and Finn-Aage Esbensen, "Special Categories of Serious and Violent Offenders: Drug Dealers, Gang Members, Homicide Offenders, and Sex Offenders," in *From Juvenile Delinquency to Adult Crime: Criminal Careers, Justice Policy, and Prevention*, eds. Rolf Loeber and David P. Farrington, New York: Oxford University Press, 2012: 118-149.

[note 8] Le Blanc, Marc, and Marcel Fréchette, *Male Criminal Activity From Childhood Through Youth: Multilevel Developmental Perspectives*, Research in Criminology, New York: Springer, 1989.

[note 9] Piquero, Alex R., J. David Hawkins, and Lila Kazemian, "Criminal Career Patterns," in *From Juvenile Delinquency to Adult Crime: Criminal Careers, Justice Policy, and Prevention*, eds. Rolf Loeber and David P. Farrington, New York: Oxford University Press, 2012: 14-46.

[note 10] See, e.g., Farrington, David P., "Key Results From the First Forty Years of the Cambridge Study in Delinquent Development," in *Taking Stock of Delinquency: An Overview of Findings From Contemporary Longitudinal Studies*, Longitudinal Research in the Social and Behavioral Sciences: An Interdisciplinary Series, eds. Terrence P. Thornberry and Marvin D. Krohn, New York: Kluwer-Plenum, 2003: 137-183; Le Blanc, Marc, and Marcel Fréchette, *Male Criminal Activity From Childhood Through Youth: Multilevel Developmental Perspectives*, Research in Criminology, New York: Springer, 1989; Loeber, Rolf, and David P. Farrington, eds., *Serious and Violent Juvenile Offenders: Risk Factors and Successful Interventions*, Thousand Oaks, Calif.: Sage, 1998.

[note 11] See, e.g., Kershaw, Chris, Sian Nicholas, and Alison Walker, Crime in England and Wales 2007/08 (pdf, 238 pages), London: Home Office, 2008; Truman, Jennifer L., and Michael R. Rand, Criminal Victimization, 2009 (pdf, 16 pages),Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, October 2010, NCJ 231327.

[note 12] See, e.g., Stouthamer-Loeber, Magda, "Persistence and Desistance in Offending" (unpublished report, Pittsburgh, Pa.: Life History Research Program, University of Pittsburgh, 2010); Le Blanc, Marc, and Marcel Fréchette, *Male Criminal Activity From Childhood Through Youth: Multilevel Developmental Perspectives*, Research in Criminology, New York: Springer, 1989.

[note 13] Piquero, Alex R., J. David Hawkins, and Lila Kazemian, "Criminal Career Patterns," in *From Juvenile Delinquency to Adult Crime: Criminal Careers, Justice Policy, and Prevention*, eds. Rolf Loeber and David P. Farrington, New York: Oxford University Press, 2012: 14-46.

[note 14] Rosenfeld, Richard, Helene R. White, and Finn-Aage Esbensen, "Special Categories of Serious and Violent Offenders: Drug Dealers, Gang Members, Homicide Offenders, and Sex Offenders," in *From Juvenile Delinquency to Adult Crime: Criminal Careers, Justice Policy, and Prevention*, eds. Rolf Loeber and David P. Farrington, New York: Oxford University Press, 2012: 118-149.

[note 15] Rosenfeld, Richard, Helene R. White, and Finn-Aage Esbensen, "Special Categories of Serious and Violent Offenders: Drug Dealers, Gang Members, Homicide Offenders, and Sex Offenders," in *From Juvenile Delinquency to Adult Crime: Criminal Careers, Justice Policy, and Prevention*, eds. Rolf Loeber and David P. Farrington, New York: Oxford University Press, 2012: 118-149.

[note 16] Howell, James C., *Gangs in America's Communities*, Thousand Oaks, Calif.: Sage, 2011.

[note 17] Horney, Julie, Patrick Tolan, and David Weisburd, "Contextual Influences," in *From Juvenile Delinquency to Adult Crime: Criminal Careers, Justice Policy, and Prevention*, eds. Rolf Loeber and David P. Farrington, New York: Oxford University Press, 2012: 86-117.

[note 18] Zara, Georgia, and David P. Farrington, "Childhood and Adolescent Predictors of Late Onset Criminal Careers," *Journal of Youth and Adolescence* 38 (3) (March 2009): 287-300.

[note 19] Welsh, Brandon C., Mark W. Lipsey, Frederick P. Rivara, J. David Hawkins, Steve Aos, and Meghan E. Hollis-Peel, "Promoting Change, Changing Lives: Effective Prevention and Intervention to Reduce Serious Offending," in *From Juvenile Delinquency to Adult Crime: Criminal Careers, Justice Policy, and Prevention*, eds. Rolf Loeber and David P. Farrington, New York: Oxford University Press, 2012: 245-277.

[note 20] Welsh, Brandon C., Mark W. Lipsey, Frederick P. Rivara, J. David Hawkins, Steve Aos, and Meghan E. Hollis-Peel, "Promoting Change, Changing Lives: Effective Prevention and Intervention to Reduce Serious Offending," in *From Juvenile Delinquency to Adult Crime: Criminal Careers, Justice Policy, and Prevention*, eds. Rolf Loeber and David P. Farrington, New York: Oxford University Press, 2012: 245-277.

[note 21] Hawkins, J. David, Eric C. Brown, Sabrina Oesterle, Michael W. Arthur, Robert D. Abbott, and Richard F. Catalano, "Early Effects of Communities That Care on Targeted Risks and Initiation of Delinquent Behavior and Substance Use," *Journal of Adolescent Health* 43 (2008): 15-22.

[note 22] Schaeffer, Cindy M., and Charles M. Borduin, "Long-Term Follow-Up to a Randomized Clinical Trial of Multisystemic Therapy With Serious and Violent Juvenile Offenders," *Journal of Consulting and Clinical Psychology*73 (3) (June 2005): 445-453.

[note 23] Welsh, Brandon C., Mark W. Lipsey, Frederick P. Rivara, J. David Hawkins, Steve Aos, and Meghan E. Hollis-Peel, "Promoting Change, Changing Lives: Effective Prevention and Intervention to Reduce Serious Offending," in *From Juvenile Delinquency to Adult Crime: Criminal Careers, Justice Policy, and Prevention*, eds. Rolf Loeber and David P. Farrington, New York: Oxford University Press, 2012: 245-277.

**Cite this Article** +

**Read More About:**

Property crime | Reports | Studies | Offenses | Justice system | Drug treatment | Habitual offenders | Crime | Juvenile delinquency | Offenders | Young adult offenders | Social and Behavioral Science

*Date Published: March 10, 2014*

**Related Publications**

Bulletin 1: From Juvenile Delinquency to Young Adult Offending (Study Group on the Transitions Between Juvenile Delinquency and Adult Crime)

Bulletin 2: Criminal Career Patterns (Study Group on the Transitions Between Juvenile Delinquency and Adult Crime)

Bulletin 3: Explanations for Offending (Study Group on the Transitions between Juvenile Delinquency and Adult Crime)

Bulletin 4: Prediction and Risk/Needs Assessment (Study Group on the Transitions Between Juvenile Delinquency and Adult Crime)

Bulletin 5: Young Offenders and an Effective Response in the Juvenile and Adult Justice Systems: What Happens, What Should Happen, and What We Need to Know (Study Group on the Transitions Between Juvenile Delinquency and Adult Crime)

Bulletin 6: Changing Lives: Prevention and Intervention to Reduce Serious Offending (Study Group on the Transitions Between Juvenile Delinquency and Adult Crime)

**Related Awards**

Study Group on Violence and Serious Offending in Late Adolescence and Young Adulthood

Article Listing
Corrections
Courts
Crime Prevention
Crimes
Drugs and Crime
Equipment and Technology
Forensic Sciences
Juvenile Justice
Justice System Reform
Law Enforcement
Tribal Crime and Justice
Victims of Crime

8/29/23, 10:20 AM
Childhood trauma linked to risk of adult crime | The University of Edinburgh
Case 7:22-cr-00426-ACA-NAD Document 42-1 Filed 09/05/23 Page 2 of 18 Exhibit B



(/)

Schools & departments (https://www.ed.ac.uk/schools-departments/)    MyEd (https://www.myed.ed.ac.uk/)



(/news)

# NEWS (/NEWS)

☰ **Menu**

Home (/)   >   News (/news)   >   2022 news (/news/2022)   >   Childhood trauma linked to risk of adult crime

Contact us (/news/contacts)

# Childhood trauma linked to risk of adult crime

## People who have suffered extreme difficulties in childhood are more likely to commit crimes as adults than those who have not, a study suggests.

Childhood experiences such as poverty, maltreatment, school exclusion and police contact are associated with serious offending and frequent criminal convictions in adulthood, the report found.

Researchers at the University of Edinburgh tracked more than 4300 people to examine their involvement in crime and anti-social behaviour from age 12 to 35 years.

A quarter of the 4300 participants had at least one criminal conviction by the age of 35. These ranged from minor offences such as theft and speeding offences through to serious criminal offences such as serious assaults.

# Adverse experiences

While most people stopped offending in their teenage years, researchers found that drug use during adolescence, being a repeated victim of crime, and having an impulsive personality were associated with continuing to offend into early middle age for some.

A history of adverse childhood experiences and trauma in adulthood – such as bereavement, relationship breakdown, and having a serious accident or illness – also affected people's ability to stay away from crime.

The findings are from the latest report of the Edinburgh Study of Youth Transitions and Crime, funded by the Nuffield Foundation.

Since 1998, researchers have been recording the pathways into and out of offending of young people from secondary school age.

> **"** *People who have contact with the criminal justice are not necessarily more likely to stop offending than those who do not. In fact, for some people, justice system contact may act as a catalyst for continued offending into adulthood.* **"**
>
> — *Professor Lesley McAra*
> *Edinburgh Law School and Co-Director of the study*

> **"** *Our research suggests that justice system intervention can only be effective in preventing offending and conviction if it works in parallel with other policy responses, such as increasing educational attainment, reducing child poverty, improving adolescent health and well-being, and dealing effectively with child maltreatment.* **"**
>
> — *Professor Susan McVie*
> *Edinburgh Law School and Co-Director of the Study*

> **"** *For over two decades the Edinburgh Study has provided policymakers and practitioners with valuable source of information about the drivers and consequences of youth offending. This latest report provides further vital insight into the lasting effects of adversity experienced in both childhood and early adulthood and highlights the need for a joined-up approach to reducing offending.* **"**
>
> — *Robert Street*
> *Director of Justice at the Nuffield Foundation*

The findings mark the eighth phase of the award-winning Edinburgh Study of Youth Transitions and Crime, which to date has generated new understanding about youth offending and contributed to reform in youth justice policy and practice in Scotland.

Link to report  (https://www.nuffieldfoundation.org/news/children-exposed-to-poverty-and-trauma-more-likely-to-offend-as-adults)

Nuffield Foundation (http://www.nuffieldfoundation.org)

Edinburgh Law School (https://www.law.ed.ac.uk/)

Image credit - JGetty/ Joshua Baker/ EyeEM

This article was published on 9 Mar, 2022

# THE UNIVERSITY OF EDINBURGH

Terms & conditions (https://www.ed.ac.uk/about/website/website-terms-conditions)
Privacy & cookies (https://www.ed.ac.uk/about/website/privacy)
Complaints procedure (https://www.ed.ac.uk/university-secretary-group/complaint-handling-procedure)
Modern slavery (https://www.ed.ac.uk/sustainability/modern-slavery-statement)

Website accessibility (https://www.ed.ac.uk/about/website/accessibility)
Freedom of information publication scheme (https://www.ed.ac.uk/about/website/freedom-information)
Data Protection (https://www.ed.ac.uk/data-protection)



(https://www.ed.ac.uk/about/mission-governance/affiliations)

MyEd login ❯ (https://www.myed.ed.ac.uk/)

The University of Edinburgh is a charitable body, registered in Scotland, with registration number SC005336, VAT Registration Number GB 592 9507 00, and is acknowledged by the UK authorities as a "Recognised body (https://www.gov.uk/guidance/recognised-uk-degrees)" which has been granted degree awarding powers.

Unless explicitly stated otherwise, all material is copyright © The University of Edinburgh 2023.

CMS login ❯ (/user/login?destination=node/134930)

Exhibit C

# Letters of Support

LaToshia Ryans

10472 Sunnyland Drive

Tuscaloosa, AL 35405

659-228-8143

Lryans09@Gmail.com

To whom it may concern,

I am writing this letter in the hopes that it will help you to see what kind of person Floyd Dawson is, despite the transgressions that have led us all to this point.

I know and support the fact that Floyd, who is my cousin, is an individual of good character. I have always known and seen Floyd to be kind, smart, considerate, and respectful. Floyd loves music, he enjoys spending time with his family, especially his nieces and nephews. He loves to joke around and loves fashion.

Floyd's transgression of Possession of a switch, which I believe was a prop for a video shoot, should not be the only factor that is looked at in this case. I hope that you will consider the fact that during the time of Floyd's arrest he along with his family was going through a very tough time with the death of his brother. I also hope that you will consider Floyd's strong commitment to his family, who love him, and who are willing to support him in any way needed. I know that Floyd is not who he is made out to be and that his transgression does not define his character, we all are given second chances to do things differently and to learn from our mistakes, and that does not exclude Floyd, I hope that you will consider this as you make your decision.

Thank you for your consideration, if there is a need to contact me, please feel free to do so.

Sincerely,

Latoshia Ryans

Narkita & Alfonzo Tucker

4230 67th Avenue

Tuscaloosa, Al. 35401


To Whom It May Concern


We are writing this letter concerning our nephew, Floyd Dawson. We would like to share with you all the Floyd we know and have helped raised. Floyd comes from a very tight nit family who loves him dearly. He is a very respectful, smart, intelligent, honest and loving young man that takes responsibility and own up to his mistakes. Growing up Floyd and his siblings have always stayed at our home; my husband and I have always had a hand in their upbringing. Floyd has always helped us out around the house, volunteered in community service activities with us, helped take care of our dogs and anything else we've asked of him. Floyd is very passionate about his music and perfecting his craft. He likes welding and is considering pursuing his career as a certified welder and working towards getting his CDL. Floyd is a magnet for the elderly, they are naturally drawn to him because of his respect and meekness towards them. In all honesty, he gets along better with older people than he does with his peers. He loves his family, especially his niece and nephews and they adore their uncle. Floyd has made a lot of bad decisions in his young life, decisions that he regrets and wishes he could change, and if given the chance we believe that he has and will continue to make positive changes in his life and everyone around him. The tragedy of losing his brother has rocked Floyd to his core, not having the chance to properly grieve his brother or see and say his final farewell has been a traumatic ordeal for Floyd and our entire family and to see how he's processing and dealing with it is showing us how much he's grown and evolved over the past fifteen months and we are so proud of him and the progress that he is making. Floyd is not just our nephew; he is like our son, and we will continue to stand with him and support him. It has been our pleasure to help raise him and with his intelligence, we know he will only get better, learn from his mistakes, make better choices and be the man he was raised to be, and the man God is shaping him to be.

Thank you for taking the time to read our letter and we pray that this letter helps you to get better acquainted with the Floyd we know.


Sincerely

Alfonzo & Narkita Tucker

# Mr. Floyd Dawson

From: Karriem Shabazz (bamashabazz@yahoo.com)

To: bamashabazz@yahoo.com

Date: Sunday, September 3, 2023 at 11:18 AM CDT

Floyd Dawson was a student of mine, in Against All Odds a nonprofit organization, several years ago; he was in my psychology mini courses transactional analysis. We would talk after each class occasionally when he wishes to share something new in his life. Floyd was a well qualified and gifted young man.

He was always prepared for class; his comments and questions stimulated good class discussion, especially in the transactional analysis classes. Many of the young men were only minimally prepared to do the class work and his classroom participation stimulated them to contribute.

Floyd has a great mind; he has impresses me as being a young person who expends the energy to accomplish whatever goals he has set for himself.

I do recommend him to you as a highly capable and willing young man

*Karriem Shabazz*

Karriem Shabazz, Minister of religions instructor

Against all Odds

Felicia Sealey
4206 38th Ave
Northport, Al 35473

To Whom it May Concern

      I have known Floyd Dawson since he was a child, he has always been a very smart, intelligent, fun-loving young man. Floyd comes from a large family where love is the key that holds everything together. There are times that he would be with his Uncle Alfonzo Tucker at the Temple, where he would stand and read from the Holy Quran at the age of 6.

      Floyd has been exposed to different things in life that has made him a well-rounded young man, he gravitated to older guys that was not the best of role models for him and began to make some bad decisions for acceptance from these guys. Some of the decisions lead him to the detention center! The last time floyd got arrested and sent off he realized how much of a passion he had for no music, and he started to dabble in music and making videos that became his escape and a way to express himself. The young man that I know and has watch grow up I never seen him carrying a gun. The only time I have seen this is when I watched his rap videos at family functions that he would proudly show his family as they made its premiere on YouTube.

      I feel like Floyd has accepted his responsibility for the part that he's had in this crime and I truly deep down in my heart feel like he has learned a huge lesson this time and he's ready to make some major changes in his life for himself as well as becoming a better person and role model for his nieces and nephews. Floyd loves his nieces and nephews, and they love him, he would spend quality time with them and since he has been locked up and has missed seeing them grow up.

      Floyd is not a perfect young man, but he has a heart of gold, and he loves his family, and they love him. I'm writing this letter because the young man that I know is a young man who deserves to be with his mom and family to help raise the twins that we're left behind when his older brother was killed and I feel that the choices that landed him here this time with everything that transpired with his brother and not being able to say his last goodbye as his brother was laid to rest, not being able to be there for his mom and sister or his nephews has really made him see how quick his life can change!

I feel that Floyd has mentally grown within the last year, and he will make much better choices!

Felicia Sealey
205-394-2642

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| **UNITED STATES OF ALABAMA,** | ) | |
| | ) | |
| | ) | |
| **V.** | ) | **CR. NO. 7:2022cr00426** |
| | ) | |
| **DAWSON, FLOYD** | ) | |
| | ) | |

**DEFENDANT'S MOTION FOR VARIANCE**

    **COMES NOW**, The Defendant, **Floyd Dawson**, by and through the undersigned counsel, and respectfully requests that this Honorable Court grant the Defendant a downward variance regarding his sentence. In support of this motion, the Defendant states as follows:

1.  When sentencing a defendant, a district court must consider all sentencing factors numerated in 18 U.S.C. § 3553(a). *United States v. Scott*, 426 F.3d 1324, 1329 (11th Cir. 2005). The § 3553(a) factors include:

    "(1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed . . . (A) to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offenses, (B) to afford adequate deterrence to criminal conduct, (C) to protect the public from further crimes of the defendant, (D) to provide the defendant with the needed vocational and educational training or medical care; (3) the kind of sentences available; (4) the advisory guideline range; (5) any pertinent policy statements issued by the Sentencing Commission; (6) the need to avoid sentencing disparities; and (7) the need to provide restitution to any victims of the offense."

    18 U.S.C. § 3553(a). While district courts must consider the advisory guideline range, the guidelines do not subordinate the other factors of § 3553(a). *United States v. Booker,* 543 U.S. 220, 245-46 (2005).

2. The Supreme Court has posited that reasonableness is the over-arching factor used to determine the appropriate sentence and the advisory guidelines are one element for determining reasonableness. *Kimbrough v. U.S.,* 552 U.S. 85, 90 (2007).

3. The Sentencing Commission has issued multiple applicable policy statements that apply to the Defendant. First is § 5H1.1, which states, "Age (*Including Youth*) may be relevant in determining if a departure is warranted, if considerations based on age, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from particular cases covered by the guidelines." (*emphasis added*). Additionally, § 5H1.3 states, "Mental and Emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines."

4. Mr. Dawson has spent fourteen months in jail awaiting the resolution of the current case.[1] In his case, Mr. Dawson has served more than enough time to allow for the respect of the law to remain intact and has served an adequate amount of time for a just punishment. On May 31, 2023, Mr. Dawson pleaded guilty to possession of a machine gun. Presentence Investigation Report, 5. This machinegun was a Glock 9mm, equipped with a "Glock switch" which is a tool used to convert a semi-automatic Glock 9mm into an automatic firearm. *Id.* at 7. However, while examining the "Glock switch,"

---

[1] Two months were concurrent with a misdemeanor state charge. However, he was not allowed to receive a bond due to the federal charge accompanying the misdemeanor charge. Therefore, he would not have been incarcerated for fourteen months but for this federal charge.

an expert reported that the switch crumbled in his hand and required adhesive or 3D printing to repair it.[2] *Id.*

5. Additionally, Mr. Dawson was nineteen at the time of this crime and his brother had passed away shortly before this charge. Studies performed by the United States Department of Justice have found that young adults, such as Mr. Dawson, are more like adolescents than adults regarding emotional regulation and decision making. (Exhibit A). Additionally, due to this innate immaturity, there is a spike in one's likelihood to commit a crime in young adults that naturally declines in early adulthood. *Id.* This spike is higher in minority groups who grow up in lower socioeconomic environments. *Id.*

6. Studies have also shown a correlation between traumatic events, grief, and depression and an increase in one's propensity to commit a crime. (Exhibit B). Here, Mr. Dawson had just tragically lost his brother three days before these charges. He was suffering from severe grief and trauma from losing his brother.

7. His age, combined with the loss of his brother impacting his emotional state, present an "unusual degree" of the age and emotional state factors provided by the sentencing commission as reasons Mr. Dawson should receive a more lenient sentence than the guidelines recommendation. Undoubtedly, the majority of those convicted of possessing a machine gun are not the same age as Mr. Dawson nor did their brothers die shortly before being charged with the crime. He is still a young man with his whole life ahead of him. He made a mistake, but it was a mistake driven by a lack of life experience and inability to cope with unexpected tragedy. Now further removed from

---

[2] This implies that the "Glock switch" was inoperable and could not have been used to perform its function of converting the semi-automatic Glock 9mm to an automatic weapon.

the tragedy, Mr. Dawson is ready to move forward with his life and rejoin society as a

young man determined to make the most of his opportunities.


**WHEREFORE, PREMISE CONSIDERED,** the undersigned prays that this Honorable

Court grants Floyd Dawson a downward variance and sentence him to fourteen months or

time served.


Respectfully Submitted,

/s/Leroy Maxwell, Jr.
Leroy Maxwell, Jr.
Attorney for Defendant


**OF COUNSEL**:
**Maxwell and Tillman, LLC**
2326 2nd Avenue North
Birmingham, AL 35203
Office: 205.216.3304
Fax: 205.409.4145
Email: maxwell@mxlawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on **September 5th, 2023**, I electronically filed the forgoing with the Clerk of
the Court using CM/ECF system which will send notification of such filing to all counsel of record.


/s/ Leroy Maxwell, Jr.
Leroy Maxwell, Jr.

Shahara Tucker
3503 38th Street Apt 303
Northport AL, 35473

To whom this may concern,

I am writing this letter on behalf of my cousin Floyd Dawson to help whomever reading this letter to see
what kind of person he is to our family, despite what has transpired and gotten us to this point.  I am
one of Floyd's older cousins more like his older sister we grew up in the same household as a big cousin I
watched him beat the odds over the years and overcome many obstacles. As a growing young man, he's
made mistakes that he's not proud of nor his family. Despite what you may have "heard '' about Floyd
he's a very lovable, intelligent, and very smart young man.  He was raised and surrounded by love from a
great family and support system despite some mistakes he's made Floyd has always taking full
responsibility for his actions. What occurred over the last year with the gun incident shouldn't be the
only factor that is being looked at. The day Floyd was arrested was a heart-breaking time June 2022 to
be exact his older brother and my little cousin was killed.  Could you imagine the person you spent your
life growing up with was killed before he could process what was going on, he was arrested two days
later. Do you know what that would do to anybody? not being able to grieve properly with your loved
ones, not being able to see your sibling for the last time is a very heartbreaking and traumatic
experience for any person. Over the last year I've seen/ heard the change in Floyd since he's been
incarcerated, he talks daily about his future and how God is working on him and with him. He really
looks at life so differently now and how quick things can change. Floyd is a very mature young man, and
his family is standing behind him 100% and ready to do whatever needs to be done so that he will not
end up back in incarcerated but instead in the free world standing in his purpose, helping his mom but
most importantly becoming a better man and helping raise his niece and nephews who love and miss
him dearly. Floyd has been incarcerated for a year and 3 months now and I'm sure he's learned a
valuable lesson so please take this letter into consideration and give this young man another chance to
make it right.

Thank you so much for taking the time to read this letter.

Shahara Tucker


*The measure of intelligence is the ability to change.'*

   - *Albert Einstein*

August 31, 2023

To Whom It May Concern:

My name is Denise Mack and I am writing in support of Floyd Dawson.  I have known Floyd for 20 years (since he was a baby) and I've watched him transition from a child into the young man he is today.

When it comes to life experiences, Floyd has suffered more than that of  the average person.  His father is and has been incarcerated most of his life, he was locked up two days after he lost his brother to gun violence.  Through all his hardships, he became seriously interested in music, he became a new uncle to twin boys (Kyran & Kyree) and a little girl (Nevaeh), and he began to change his friend circle in efforts to move in a positive direction.

I've had the opportunity to work with him as a student in elementary school.  He has always been respectful, a student of good character, and very intelligent. As a child, Floyd received a diagnosis of ADHD, which resulted in his lack of focus and impulsive decision-making and as he got older  he started acting out more and hanging with much older guys and he became more defiant in which resulted in his mother moving from the neighborhood where his influence wasn't that great to a small country town called moundville while seeking help from people that helped kids with behavioral issues. It is true that he has made some bad decisions, however; he has learned from them, and we all fall short sometimes.  I had the opportunity to speak with him about the poor decisions he has made in the past and not only has he expressed remorse, but he has also demonstrated willingness to change as he wants to contribute some his time to other youth by speaking with them about his past, his regrets, and how he is now intrinsically motivated to not only become a better son, brother, uncle and friend, but also a productive citizen in society and a lifelong learner.  Please put yourself in his shoes...how would you feel?  How would you want the people who hold your freedom in their hands to consider you?  If he were your child, would you be fighting for his freedom?  Would you feel that he deserves freedom? Please consider that everyone deserves grace and second chances.  He is not too far gone to come back as he as already turned the bend and understands the necessary changes that need to be made and quite frankly, he had already started with change in mindset and actions.

In closing, Floyd is a young man (20 yrs. old) who has a lot to learn and a lot to share with others who have the same struggles as he does.  He stands to make a more positive impact on this side or the bars (free world).  He needs to grieve properly and deal with the death of his brother with professional help and support from his family.  Upon release, I believe that Floyd will do what we envision for everyone that has been released from prison will do and that is to be a loving uncle, a loving son, a good brother, a great employee, and a responsible person who will self-seek the mental health & grief counseling that he needs. With his newfound joy and appreciation for life, family, and freedom, I wholeheartedly hope that you will consider granting him the minimum sentence/time served to help support his efforts for continued self-improvement (family, career, & education) without restrictions.  He, himself, is willing to stand before you and be honest about his poor decisions and about the person he has become **vs.** the person he was.  Thank you for your time and consideration.

Respectfully,
Denise Mack
205-792-6522

mackd7th@yahoo.com

Roscoe Ezell
10507 Rolling Valley Drive
Cottondale, AL 35453
August 31, 2023

Subject: Character Reference for Floyd Dawson

Dear Sir/Madam,

I am writing this letter on behalf of Floyd Dawson.  I am Roscoe Ezell, Owner Operator and
CEO of KNC Trucking, LLC.  I have served as one of Floyd's mentors and a family friend for
many years.  I feel strongly about the goodness of Floyd's character and his ability to transform
his life.

Floyd is a very smart and creative young man with the potential to be a great leader.  He is
naturally funny and loved by many. Previously, I employed Floyd to help with odd jobs in my
business.  He is a hard-worker and follows instructions well.

It is my sincere hope that the court takes this letter into consideration.  Floyd has made mistakes,
of which I am sure he is deeply remorseful.  Despite this case, I still believe Floyd Dawson to be
an honorable individual and a good human being with a big heart who possesses the potential to
be a valuable member of the community.  Floyd has a very strong support system and a
determination to live a successful life. I believe that given the chance, Floyd will make us all
proud.

Thank you for taking time to read and consider this letter.


Sincerely,

*Roscoe Ezell*

Roscoe Ezell
KNC Trucking, LLC
CEO